UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x

EBIN NEW YORK, INC.,

                  Plaintiff,

        - against -

SIC ENTERPRISE, INC.; JOHN DOES 1-10
(said names being fictitious); and JOHN ROE
CORPS. (said names being fictitious),[1]

                  Defendant.

--------------------------------------------------------x

**MEMORANDUM & ORDER**

19-CV-1017 (PKC) (TAM)

PAMELA K. CHEN, United States District Judge:

Big disputes come in small containers.

While the parties in this action have litigated a number of claims over multiple years, the main question remaining for the Court is whether a small, clear, double-layered plastic container constitutes protectable trade dress under the Lanham Act. Defendant SIC Enterprise, Inc. ("Defendant") has moved for summary judgment against Plaintiff EBIN New York, Inc. ("Plaintiff"), arguing that, based on the undisputed material facts, Plaintiff cannot prove that its container is protectable trade dress. Plaintiff opposes Defendant's motion for summary judgment and in turn seeks partial summary judgment on Defendant's affirmative defenses to this lawsuit.

---

[1] The Clerk of Court is respectfully directed to terminate Defendant Cleo Beauty from the docket because all claims against this defendant were dismissed by stipulation dated July 6, 2022 (Dkts. 107, 108; *see also* 7/8/2022 Docket Order.) The "John Doe" and "John Roe" defendants are dismissed without prejudice and should also be terminated from the docket. *See Cox v. Vill. Of Pleasantville*, 271 F. Supp. 3d 591, 618 (S.D.N.Y. 2017) ("It is well settled that where a plaintiff has made no attempt to amend its complaint to include the real identities of John Doe Defendants and discovery has closed, the proper course is to dismiss the John Doe Defendants without prejudice.").

For the reasons set forth below, the Court grants summary judgment in favor of Defendant and dismisses Plaintiff's Lanham Act claim. Therefore, Plaintiff's cross-motion on Defendant's affirmative defenses is denied as moot. Additionally, the Court declines to exercise supplemental jurisdiction over Plaintiff's state-law claim.

## BACKGROUND

### I. Relevant Facts[2]

#### A. Plaintiff's Product and Container

Plaintiff is a hair products company formed in October 2014 by brothers Joon S. ("John") and Joon O. ("James") Park. (Def.'s 56.1 Statement, Dkt. 136-2 (hereinafter "Dkt. 136-2"), ¶ 31.) John Park is the President of Plaintiff and James Park is the Vice President and CEO of Plaintiff. (Pl's. Counter-Statement of Material Fact, Dkt. 125 (hereinafter "Dkt. 125"), ¶ 3.) Plaintiff's first products were hair extensions and hair styling products. (Dkt. 136-2, ¶ 32.) In its first year as a company, Plaintiff began selling what is considered its "classic" product—a hair product commonly referred to as edge control—named 24 Hour Edge Tamer ("Edge Tamer"), which initially came in a four-ounce container. (*Id.* ¶ 33.) Edge control is a hair product akin to a pomade, wax, or gel used for the purpose of slicking and controlling the hairs along a person's hairline,

---

[2] Unless otherwise noted, a standalone citation to a party's 56.1 statement denotes that this Court has deemed the underlying factual allegation undisputed. Any citation to a 56.1 statement incorporates by reference the documents cited therein; where relevant, however, the Court may cite directly to an underlying document. The Court construes any disputed facts in the light most favorable to Plaintiff, as the non-moving party, for purposes of Defendant's summary judgment motion. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144 (1970). However, where Plaintiff either (i) admits or (ii) denies without citing to admissible evidence certain of the facts alleged in Defendants' Local Rule 56.1 Statement (Dkt. 136-2), the Court may deem any such facts undisputed. *See* Local Rules of the United States District Courts for the Southern and Eastern Districts of New York 56.1(c)–(d).

sometimes referred to as "baby hairs."[3]  (*Id.* ¶ 34.)  After releasing its four-ounce Edge Tamer

product in 2014, Plaintiff expanded the Edge Tamer line to include three different sizes: .5 ounce,

2.7 ounces, and 8.5 ounces.  (*Id.* ¶ 35.)  Of the four sizes of Edge Tamer, only the 2.7-ounce product

uses the clear, double-layered container ("CDLC") at issue in this lawsuit.  (*Id.* ¶ 36.)  The CDLC

prominently displays Plaintiff's registered 24 Hour Edge Tamer mark.  (*See id.* ¶¶ 36–37.)  Images

of Plaintiff's CDLC are below:



(Def's. Br. Summ. J., Dkt. 136-1 (hereinafter "Dkt. 136-1"), at ECF 9; Dkt. 125, ¶ 14.)

Plaintiff's Fourth Amended Complaint describes the "Alleged Trade Dress" as: a "double-

layered container, the outer layer being transparent and clear in color and made of polyethylene

terephthalate, also known as PET or PETE, and the inner layer being opaque and varying in color

---

[3] Plaintiff urges the Court to employ an excessively narrow definition of edge control products—discussed further *infra* at II.A.—in place of this formulation.  The Court need not adopt Plaintiff's proffered definition because it is a legal conclusion masquerading as a fact.  (*See* Park Decl., Dkt. 127, ¶¶ 33–35 (proffered definition of edge control appears in a section of Plaintiff's President's declaration called "Edge Control is a Distinctive Product Category").)  In essence, Plaintiff offers a restrictive definition of edge control products in an effort to narrow the relevant market in which the Court will evaluate whether Plaintiff's trade dress is generic or distinctive.  The Court does not accept Plaintiff's legal conclusion.  *See Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 394 (S.D.N.Y. 2015) ("[T]he Court can [] disregard legal conclusions or unsubstantiated opinions in a [] Rule 56.1 statement." (collecting cases)).  Furthermore, the Court finds that this statement is "conclusory and argumentative" and declines to adopt it on that basis.  *See Epstein v. Kemper Ins. Cos.*, 210 F. Supp. 2d 308, 314 (S.D.N.Y. 2002).

(e.g. grape-purple, lemon-yellow, orange, and chocolate), made of a similar plastic substance." (Dkt. 136-2, ¶ 54.) Plaintiff ceased selling Edge Tamer in the "grape-purple, lemon-yellow, [and] orange" packaging mentioned in the product description at some point in 2016. (*Id.* ¶ 55.) Though Plaintiff retained lawyers to "provide legal counsel [] in connection with Trademark [sic] registration of the container used for 24-Hour Edge Tamer," Plaintiff has never filed an application to register the CDLC. (*Id.* ¶¶ 65, 66.)

Plaintiff selected the CDLC from containers made by Royol Wong of Bingo Cosmetic Manufacture Ltd. ("Bingo"), Plaintiff's Chinese manufacturing company. (Def.'s Ex. G, Dkt. 136-13, 145:8–24.) During the selection process, John Park stated that Bingo had around one hundred containers to choose from and Park selected the CDLC from an "actual sample" that he could pick up and touch. (*Id.*)

Since 2014, Edge Tamer has enjoyed commercial success, selling 62,744 units in the 2.7-ounce size (that comes in the CDLC) in 2015 and 242,045 units in 2016, which equated to $196,107.52 and $866,665.59 in annual revenue, respectively. (Dkt. 125, ¶¶ 37–40.) Plaintiff spent $52,000 in 2015 and $67,000 in 2016 on its advertising budget for all of its products. (Dkt. 136-2, ¶ 51.)

**B.    Defendant's Product and Container**

Defendant is a competitor of Plaintiff and began selling its trademarked EDGE BOOSTER ("Edge Booster") edge control product in November 2016, which uses a similar CDLC to the 2.7-ounce Edge Tamer, approximately two years after Edge Tamer hit the market. (Dkt. 136-2, ¶ 85; *see also* Dkt. 40-1, at ECF[4] 25 (Defendant's Edge Booster trademark registration certificate).)

---

[4] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

Defendant's products have vibrant-colored interiors that are paired with various flavors. (*Id.* ¶ 86.) Images of Defendant's Edge Booster are below:



(*Id.*) Defendant sourced its CDLC from Perfect Link Cosmetic Co. in China ("Perfect Link"). (*Id.* ¶ 88.) Defendant's founder and CEO Joel Lee had seen a number of clear or opaque double-layer containers used in the hair style products market before having Edge Booster packaged in the same type of container. (*Id.* ¶ 91.) In his outreach to Perfect Link, Lee referred the company to other products packaged in a CDLC, including the 2.7-ounce Edge Tamer product, to serve as benchmarks during the manufacturing process. (*Id.* ¶ 90, *see also* Pl's. Ex. C, Dkt. 126-3.) Communications between Lee and Perfect Link regarding the packaging and the Edge Booster product lasted from at least February to November 2016 and included numerous messages regarding packaging. (*See* Pl's. Ex. C, Dkt. 126-3.)

### C. Use of CDLCs in the Marketplace

Clear, double-layered plastic containers are commonly used for cosmetics products, including many products that are specifically geared toward hair care. (Dkt. 136-2, ¶ 30.) For example, Bingo, the company that manufactures Plaintiff's CDLC, itself has a haircare brand called Posa that sells a hair product in a similar container. (Dkt. 136-2, at ¶ 46.)



(Dkt. 136-1, at ECF 14.)  Posa is far from the only cosmetics or haircare brand to use a CDLC. Some examples are StyleSexyHair's Control Maniac hair wax product, ColorProof RuleBreaker hair wax product, and Rene Furterer Paris Absolute Keratin Ultimate Repairing Mask products. (Dkt. 136-2, ¶¶ 1, 4, 16, 17.)  Images of these products follow:



(*Id.*)

Amid the deep market for haircare products, Defendant introduced Edge Booster contemplating that this product would compete with Plaintiff's Edge Tamer.  (*See, e.g.*, Pl's. Ex. O, Dkt. 126-16, at ECF 4 (text from Lee to the owner of one of Defendant's retail outlets asking, "What if Style Factor makes a big hit like Ebin[?]").  Lee also sent a message to Perfect Link with his request for a container, attaching "sample pictures" of Plaintiff's CDLC.  (Dkt. 126-3, at ECF 4.)  It was not just Defendant who studied Plaintiff's product, however.  Both parties to this lawsuit were observing one another.  For example, in 2020, Plaintiff sought to create an acrylic display case for its Edge Tamer products and sent photos of Defendant's acrylic display case to its manufacturer to be "used as reference" during the manufacturing process.  (Def's. Ex. O, Dkt. 136-

21, John Park Dep. 201:8–202:13.) Additionally, Plaintiff mentioned Defendant's Edge Booster in intra-company market research materials to study its sales and other trends related to the product. (Dkt. 136-2, ¶ 96; *see also* Pl's. Ex. G, Dkt. 26-8, John Park Dep. 161:10–15.)

*   *   *

In sum, the evidence shows that the CLDC—which is, in essence, a prefabricated container—was a commonly used container in the market for hair products.

## II.    Procedural History

Plaintiff sued Defendant on February 20, 2019, alleging three causes of action: (1) Trade Dress Infringement (Lanham Act, 15 U.S.C. § 1125(a), N.Y. Gen. Bus. § 360-k); (2) Trade Dress Dilution (Lanham Act, 15 U.S.C. § 1125(c), N.Y. Gen. Bus. § 360-l); and (3) New York Common Law Unfair Competition. (Compl., Dkt. 1.) On April 1, 2019, Plaintiff amended its complaint to include an aiding and abetting claim and a contributory infringement claim against various distributor defendants who contracted or engaged in wholesale or distribution business with Defendant. (Am. Compl., Dkt. 11.) On April 22, 2019, Defendant filed a pre-motion conference ("PMC") request regarding its anticipated motion to dismiss. (Dkt. 33.) The Court granted the PMC request and met with the parties on May 23, 2019. (*See* 5/23/2019 Minute Entry.) Thereafter, Plaintiff filed its Second Amended Complaint, which no longer contained a trade dress dilution claim against Defendant. (Dkt. 40.) Certain distributor defendants were dismissed in the intervening months. (*See* Dkt. 45.)

On October 1, 2020, Defendant filed three counterclaims against Plaintiff—one for Trade Dress Infringement in violation of 15 U.S.C. § 1125(a); one for Trademark Infringement in violation of 15 U.S.C. §§ 1114(1), 1125(a), and the common law; and one for "unfair competition in violation of the common law." (Dkt. 73, 15–18.) These claims stemmed from Plaintiff's use

of an acrylic display case similar to the one used by Defendant, Plaintiff's rollout of "fruity" 24-Hour Edge Tamer in the disputed CDLC with varying colors similar to Defendant's colorful Edge Booster products, and Plaintiff's use of "#edgebooster" to promote 24-Hour Edge Tamer on Plaintiff's Instagram page. (*Id.* ¶¶ 11, 14, 20.)

On October 5, 2020, Plaintiff filed a Third Amended Complaint against Defendant and distributor defendant CLEO Beauty to include information on the acrylic display case used for the products in issue. (Dkt. 75.)

By stipulation dated June 6, 2022, the parties agreed to several actions relating to this case, including: (1) dismissing Plaintiff's third and fourth causes of action from the Third Amended Complaint—the distributor aiding and abetting claim and the distributor contributory infringement claims—as moot; (2) dismissing portions of Defendant's counterclaims against Plaintiff; and (3) dismissing five of Defendant's eleven affirmative defenses. (Dkt. 107.) The parties also agreed that these actions rendered moot Plaintiff's trade dress claims with respect to the design of its acrylic display cases and Plaintiff's claims for actual damages. (*Id.*) By Order and Judgment dated July 21, 2022, the Court entered the stipulation and also entered judgment in favor of Defendant on its remaining counterclaims against Plaintiff—(1) trademark infringement based on Plaintiff's use of the Edge Booster mark in social media posts; and (2) common law unfair competition. (Dkt. 108.)[5]

On July 22, 2022, Plaintiff filed a Fourth Amended Complaint, which is the operative complaint before the Court. (Dkt. 109.)

---

[5] The day after the Court ruled on the remaining counterclaims, Defendant submitted amended counterclaims (Dkt. 111) that appear to be the same claims that the Court ruled on in its July 21, 2022 Judgment and Order. Defendant is directed to file a status report within two weeks of this Memorandum and Order informing the Court as to the status of its amended counterclaims.

On August 12, 2022, Defendant moved for summary judgment on Plaintiff's remaining trade dress infringement and unfair competition claims, arguing that the alleged trade dress is not inherently distinctive nor has it acquired secondary meaning (Dkts. 113, 136-1), and Plaintiff moved for partial summary judgment on Defendant's remaining affirmative defenses (Dkts. 114, 123). The parties' respective motions were fully briefed on October 18, 2022. (Dkts. 123–39.)

## DISCUSSION

### I.   Legal Standard

To obtain summary judgment, the moving party must establish that "there is no genuine dispute as to any material fact," and, thus, that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008). "Where the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of the claim, any factual disputes with respect to other elements of the claim become immaterial and cannot defeat a motion for summary judgment." *See Champagne v. Diblasi*, 36 F. App'x 15, 17 (2d Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

Where the defendant is the moving party, it bears the initial burden to show that the evidence does not give rise to a "genuine" dispute over the facts legally relevant to the plaintiff's claim, or any element thereof—in essence, a dispute that would allow a "reasonable jury" to "return a verdict for" the plaintiff. *Gerffert Co., Inc. v. Dean*, 41 F. Supp. 3d 201, 209 (E.D.N.Y. 2014) (granting summary judgment for defendants on trade dress claim). There is "no express or implied requirement" that the defendant "negat[e] [the plaintiff's] claim" with evidence of its own, as long as it "point[s] out to the district court . . . that there is an absence of evidence to support [the plaintiff's] case." *Celotex Corp.*, 477 U.S. at 323, 325 (emphasis omitted). Once Defendant

has met this burden, the plaintiff must "do [ ] more than simply rely on the contrary allegation[s] in [its] complaint," and "go beyond the pleadings" to "designate specific facts showing that there is a genuine issue for trial." *Adickes*, 398 U.S. at 160; *Celotex Corp.*, 477 U.S. at 324 (quotations omitted); *see also D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998) (explaining that non-moving party "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence" to defeat summary judgment) (collecting cases), *cert. denied*, 524 U.S. 911 (1998). That is, "a plaintiff opposing summary judgment may not rely on his complaint to defeat the motion[.]" *Champion v. Artuz*, 76 F.3d 483, 485 (2d Cir. 1996) (per curiam).

## II.    Federal Trade Dress Claim

Under the Lanham Act "[a]ny person who, on or in connection with . . . any container for goods, uses in commerce any word, term, name, symbol, or device . . . which . . . is likely to cause confusion . . . shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act." 15 U.S.C. § 1125(a). The Lanham Act protects trademarks for products and their trade dress. *See Wal-Mart Stores v. Samara Bros.*, 529 U.S. 205, 209 (2000) (noting that trade dress constitutes "symbol" or "device" for Lanham Act purposes). "Trade dress includes the 'design or packaging of a product.'" *Gerffert,* 41 F. Supp. 3d at 210 (quoting *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 28 (2001)).[6] Trade dress is a "nebulous category that refers to the 'overall design and appearance that makes the product identifiable to consumers.'"

---

[6] Defendant argues that the CDLC in question "falls somewhere on the border of product design and product packaging" as contemplated by the Supreme Court in *Wal-Mart*. (529 U.S. at 215; Dkt. 136-1, at ECF 26 n.16.) In *Wal-Mart*, the Supreme Court held that product design cannot be inherently distinctive (and thus protectible) absent a showing of secondary meaning, unlike product packaging, which *can* be inherently distinctive. 529 U.S. at 216. Courts since *Wal-Mart* have not policed the fuzzy boundary between product packaging and product design, so here, the Court elects to analyze the CDLC as product packaging and undertakes both inherent distinctiveness and secondary meaning analyses.

*Kaufman & Fisher Wish Co., Ltd. v. F.A.O. Schwartz*, 184 F. Supp. 2d 311, 316 (S.D.N.Y. 2001) (quoting *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 118 (2d Cir. 2001)); *see also Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 764 n.1 (1992) (trade dress consists of the "total image and overall appearance . . . of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques" (citation omitted)).

"[P]rotection for trade dress exists to promote competition." *TrafFix*, 532 U.S. at 28. As such, "[t]rade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products." *Id.* at 29. Assessing a trade dress claim "will always require a look at the product and the market in which it competes" and must be "construed in the light of strong federal policy in favor of vigorously competitive markets[.]" *FC Online Mktg., Inc. v. Burke's Martial Arts, LLC*, No. 14-CV-3685 (SJF) (SIL), 2015 WL 4162757, at *9 (E.D.N.Y. July 8, 2015) (quoting *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 379 (2d Cir. 1997)).

To prevail on a federal trade dress claim, Plaintiff has the burden of proving that its trade dress is (1) inherently distinctive or has acquired distinctiveness through secondary meaning; (2) there is a likeliness of confusion between Plaintiff's trade dress and the Defendant's allegedly infringing trade dress; and (3) the trade dress is non-functional. *Gerffert*, 41 F. Supp. at 211. The distinctiveness and non-functionality prongs relate to protectability of the trade dress while the likelihood of confusion prong relates to Defendant's liability for trade dress infringement. *Two Pesos*, 505 U.S. at 769–70.[7]

---

[7] The infringement analysis is the same in trademark and trade dress cases when the same or analogous concepts are involved. The Court therefore cites to cases and principles that derive from trademark infringement disputes in addition to trade dress cases. *See, e.g., River Light V,*

"The general rule regarding distinctiveness is clear: an identifying mark is distinctive and capable of being protected if it *either* (1) is inherently distinctive *or* (2) has acquired distinctiveness through secondary meaning." *Mana Prods., Inc. v. Columbia Cosms. Mfg., Inc.*, 65 F.3d 1063, 1069 (2d Cir. 1995) (quoting *Two Pesos,* 505 U.S. at 769). "If a trade dress is inherently distinctive, it is not necessary to establish that a product has acquired secondary meaning in the marketplace because the packaging itself 'is capable of identifying products or services as coming from a specific source.'" *Id.* (quoting *Two Pesos*, 505 U.S. at 773).

To establish that a trade dress is distinctive, the item is assessed based on four classifications along a spectrum of increasing distinctiveness that Judge Henry Friendly articulated for trademark claims in the Second Circuit's decision in *Abercrombie & Fitch Co. v. Hunting World, Inc.* ("*Abercrombie*"): (i) generic, (ii) descriptive, (iii) suggestive, and (iv) arbitrary or fanciful. 537 F.2d 4, 9 (2d Cir.1976); *see also Paddington Corp. v. Attiki Imps. & Distribs., Inc.,* 996 F.2d 577, 583 (2d Cir. 1993) (holding that "the *Abercrombie* classifications apply to trade dress"). "Arbitrary or fanciful" and "suggestive" trade dress are "inherently distinctive"; "descriptive" trade dress is distinctive *only* if it acquires "secondary meaning"; and "generic" trade dress is *never* distinctive, even if accompanied by a showing of secondary meaning. *Paddington Corp.*, 996 F.2d at 583.

The arbitrary/fanciful classification extends to trade dress "applied in an unfamiliar way," or "invented solely," to designate specific goods. *See Abercrombie*, 537 F.2d at 11 n.12. The suggestive classification extends to trade dress that "requires imagination, thought and perception to reach a conclusion as to the nature of [the] goods." *Id.* at 11 (quoting *Stix Prods., Inc. v. United*

---

*L.P. v. Olem Shoe Corp.*, No. 20-CV-7088 (LGS), 2022 WL 4484575, at *3 (S.D.N.Y. Sept. 27, 2022) (applying trademark cases to discuss an alleged trade dress violation).

*Merchs. & Mfrs. Inc.*, 295 F. Supp. 479, 488 (S.D.N.Y. 1968)). The descriptive classification extends to trade dress that "forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods." *Id.* (quoting *Stix Prods., Inc.*, 295 F. Supp. at 488). Finally, the generic classification extends to trade dress that simply "refers . . . to the genus of which the [goods] [are] a species." *Id.* at 9.

For the reasons that follow, the Court finds that the CDLC which Plaintiff uses for its 2.7-ounce Edge Tamer product is neither inherently distinctive nor has it acquired distinctiveness through secondary meaning.

### A. Inherent Distinctiveness or Non-Distinctiveness

Defendant argues that the CDLC is generic—and thus can never be distinctive—because it has "long been presented to the purchasing public" and similar containers are available from multiple wholesale manufacturers. (Dkt. 136-1, at ECF 28.) Indeed, the fact that Plaintiff and Defendant purchased their containers from different manufacturers supports the conclusion that the CDLC is widely available product packaging. Further to this point, Defendant's manufacturer noted that the CDLC is "very common in China, even in Guangzhou, there're [sic] not less than 50 suppliers have made this jar." (Dkt. 138, at 3.) And it's not only the parties in this case who use a CDLC. Defendant has pointed to several other companies that manufacture and/or market hair products that use containers remarkably similar to the CDLC, including StyleSexy Hair, ColorProof, and Rene Furterer. (Dkt. 136-2, ¶¶ 1, 4, 16.) This is compelling evidence given that third-party use for similar or related goods weighs against a finding of distinctiveness. *See Regal Jewelry Co., v. Kingsbridge Int'l., Inc.*, 999 F. Supp. 477, 489 (S.D.N.Y. 1998) (rejecting an inherent distinctiveness argument because Plaintiff's packaging was "extremely common"); *see also Lever Bros. v. Mattel, Inc.*, 609 F. Supp. 1395, 1402 (S.D.N.Y. 1985) (finding no "likelihood

of confusion" because the mark "Snuggle" was "weak" given that it was "commonly used" by third parties, especially "in the same or closely related fields[.]").

To rebut what the naked eye perceives, Plaintiff argues that it is not appropriate to compare Edge Tamer to the products sold by StyleSexy Hair, ColorProof, and Rene Furterer, among others. Rather, Plaintiff claims that the proper universe of products with which to compare Edge Tamer are edge control products only (Dkt. 124, at 9), which Plaintiff then narrowly defines as "a water based highly viscous clear hair styling product, specifically formulated for smoothing, laying down or sculpting the delicate hair around the perimeter or edges of the hairline most typically found in African American women." (Dkt. 125, ¶ 2.) The Court will not adopt such an artificially cramped and self-serving definition of the product at issue—for which Plaintiff proffers solely on the basis of its President's testimony (*id.*). *See Congregation Rabbinical Coll. of Tartikov, Inc*, 138 F. Supp. 3d at 394. The Court agrees with Defendant that consumers do not view product categories so "myopically." (Dkt. 138, at 2.) Indeed, the United States Patent and Trademark Office places Plaintiff's Edge Tamer products in the broad category of "[h]air care preparations; [h]air pomades[.]" (Def's. Ex. TT, Dkt. 136-51.) Furthermore, courts generally apply broader boundaries when defining the relevant universe of consumer products in Lanham Act cases. *See, e.g.*, *Giggle, Inc. v. netFocal, Inc.*, 856 F. Supp. 2d 625, 631 (S.D.N.Y. 2012) (finding that plaintiff's "GIGGLE" marks did not acquire secondary meaning when compared to those of Defendant within the "children's goods" market); *id.* ("Plaintiff has failed to show that its marks resonate with more than a limited audience."); *Nabisco v. Warner-Labert Co.*, 32 F. Supp. 2d 690, 698–99 (S.D.N.Y. 1999) (finding the plaintiff's "Ice Breakers" mark comparatively weak when compared to other products bearing similar names "within the confections field"). The Court therefore considers the CDLC used by Plaintiff for its 2.7-ounce Edge Tamer product in the market

for hair products, as it strikes the appropriate balance between larger and smaller (i.e., product-specific) categories of cosmetics items.

When viewed in the hair products market, it is clear that Plaintiff's Edge Tamer CDLC is not inherently distinctive. As the defense argues, the fact that Plaintiff's and Defendant's respective containers were purchased from independent manufacturers—one of which noted that "not less than 50 suppliers have made this jar" (Dkt. 138, at 3)—clearly shows that the CDLC Plaintiff uses for its Edge Tamer product is widely available to companies in the hair products field. Defendant has also demonstrated that other companies in the hair products industry use essentially the same CDLC. (*See* Dkt. 136-2, ¶¶ 1, 4, 16, 17 (images of StyleSexyHair's Control Maniac, ColorProof RuleBreaker, and Rene Furterer Paris Absolute Keratin Ultimate Repairing Mask products).) Indeed, even the manufacturing company from which Plaintiff sourced its CDLC, Bingo, uses the same container for its Posa hair product (*see* Dkt. 136-1, at ECF 14). Based on this evidence, it would "def[y] simple logic" for the Court to conclude that Plaintiff's 2.7-ounce Edge Tamer CDLC is inherently distinctive. *Mana Prods., Inc.*, 65 F.3d at 1070.

Given that Plaintiff's CDLC is not inherently distinctive, the Court considers whether it otherwise qualifies as distinctive pursuant to the standards set forth in *Abercrombie*. Plaintiff's CDLC is certainly not "fanciful" or "arbitrary," as Plaintiff haphazardly argues, because it was not "invented" solely for marketing Edge Tamer. *Abercrombie,* 537 F.2d at 11 n.12. Rather, as discussed, the same type of CDLC used by Plaintiff for its Edge Tamer product is regularly used in the hair product market. Nor is Plaintiff's CDLC suggestive because the alleged trade dress does not require "imagination, thought and perception" to discern what the CDLC contains, i.e., a hair styling product. *Id.* at 11.

However, whether Plaintiff's CDLC is "generic," or crosses the threshold into "descriptive" trade dress is a closer question.[8] Trade dress is generic if it is a "generalized idea," *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.* ("*Milstein*"), 58 F.3d 27, 34 (2d Cir. 1995); it is "descriptive" if it "forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods[,]" *Abercrombie*, 537 F.2d at 11. The Court concludes that no jury could find, based on the undisputed evidence, that Plaintiff's CDLC meets the definition of descriptive trade dress. Given the near-ubiquitous presence of CDLCs to package a variety of products in the haircare market, Plaintiff's CDLC simply does not "forthwith convey[] an immediate idea of the ingredients, qualities or characteristics of the goods." *Id*. A consumer in that market could believe that the contents of a CDLC like Plaintiff's could be anything from a hair wax like StyleSexyHair's Control Maniac to a hair mask like Rene Furterer's Absolute Keratin product.

Plaintiff, however, argues that its Edge Tamer CDLC is descriptive when viewed in the far more circumscribed market of edge control products only. (Dkt. 124, at 1.) Aside from the Court's finding that defining the market so narrowly is unjustified (*see supra* note 2), this argument is otherwise unavailing. The Court finds *Milstein* instructive on this issue. In *Milstein*, the plaintiff, a greeting card manufacturer, sought trade-dress protection for its die-cut photographic greeting cards, arguing that its use of this technique was inherently distinctive because it had never been used before in the greeting card industry, which the plaintiff maintained was the relevant consumer market. *Milstein*, 58 F.3d at 33. The Second Circuit rejected this argument, finding that the plaintiff's use of die-cut photography for its greeting cards was a "generalized idea" and thus

---

[8] Defendant, for its part, seemingly concedes that the CDLC is "properly classified as generic *or descriptive*." (Dkt. 136-1, at ECF 28 (emphasis altered).)

"generic." *Id.* at 34. As the panel explained: "Just as the first company to depict a heart and an arrow on Valentine's cards or to produce cards depicting tabby cats could not seek protection for those designs because they are concepts, defined abstractly, so [the plaintiff] cannot obtain protection for its general idea of creating cards out of die-cut photographs." *Id.* at 33. In other words, defining the relevant market narrowly did not save the alleged trade dress from being an unprotectable "generalized idea."

The same reasoning applies here. It does not matter that Plaintiff is seeking protection only in the market for edge control products. Even if the Court were to confine the relevant market to these products, Plaintiff still could not demonstrate that its use of the CDLC for its 2.7-ounce Edge Tamer product is anything more than a "generalized idea." Indeed, as Defendants have demonstrated, Plaintiff was not the first or only edge control manufacturer to use CDLCs to package its product. Defendant has submitted undisputed evidence of StyleSexyHair's Control Maniac—which has packaging quite similar to the CDLC (*see supra* p. 6)—being used as an edge control product. A Youtube video posted on May 26, 2016 shows a consumer demonstrating the Control Maniac product and stating in the description appearing below the video, "I have been loving the product[,] it has been so helpful with *taming my baby hairs*." (Dkt. 136-2, ¶ 17 (emphasis added).) Thus, as in *Milstein*, defining the relevant market more narrowly does not save Plaintiff's CDLC from being generic.

In sum, there is nothing to suggest that Plaintiff's CDLC is distinctive, i.e. "capable of identifying a particular source of the product," *Two Pesos,* 505 U.S. at 771, or that the CDLC is anything more than generic trade dress. Nonetheless, recognizing the inherent imprecision of this endeavor, *see, e.g.*, *Regal Jewelry Co.,* 999 F. Supp. at 489–90 (finding that plaintiff's "box designs" used to package its novelty items were descriptive because novelty items came in a

variety of packages and there was no "singular custom in the industry"), the Court assumes for the sake of argument that Plaintiff's CDLC could qualify as descriptive trade dress, and conducts a secondary meaning analysis. *See Paddington Corp.*, 996 F.2d at 583 (finding that "descriptive" trade dress is distinctive *only* if it acquires "secondary meaning").

### B.     Secondary Meaning

As indicated, "in an abundance of caution," the Court considers whether a jury could find that the Edge Tamer CDLC acquired secondary meaning in the market for hair products, which would entitle it to trade dress protection. *See Conte v. Newsday, Inc.*, No. 06-CV-4859 (JFB) (ETB), 2013 WL 978711, at *19 (E.D.N.Y. Mar. 13, 2023). Whether trade dress has acquired secondary meaning in the minds of consumers is a question of fact that turns on the holistic consideration of six non-dispositive factors: (1) consumer studies, (2) length and exclusivity of use, (3) sales success, (4) advertising expenditures, (5) unsolicited media coverage, and (6) attempts to plagiarize. *See C.M.B. Prods., Inc. v. SRB Brooklyn*, *LLC*, No. 19-CV-2009 (ENV) (CLP), 2022 WL 2704506, at *4 (E.D.N.Y. July 12, 2022) (citing *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1041 (2d Cir. 1992)).

Summary judgment in favor of Defendant is appropriate if Plaintiff has failed to show that a reasonable trier of fact could conclude that the Edge Tamer CDLC had acquired secondary meaning at the time Defendant began selling Edge Booster (in a CDLC) in November 2016. *Id.* And while district courts should be cautious in weighing the secondary meaning factors at the summary judgment stage, summary judgment is nonetheless warranted in cases where the proponent of the alleged trade dress has failed to raise a material issue of fact on the question of secondary meaning. *See Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc.*, 478 F. Supp. 2d 340, 344 (E.D.N.Y. 2007) (finding a mark had not acquired secondary meaning (citing *Mana*

*Prods., Inc.*, 65 F.3d at 1071)). Here, the Court finds that the secondary-meaning factors, on balance, weigh against Plaintiff, and that no jury could find that Plaintiff's 2.7-ounce Edge Tamer CDLC had acquired secondary meaning by November 2016.

### 1.   Consumer Surveys

With respect to the consumer-survey factor, Plaintiff has offered no evidence of consumer surveys, which are "the most direct and persuasive evidence of secondary meaning."[9] *Black & Decker Corp. v. Dunsford*, 944 F. Supp. 220, 227 n.9 (S.D.N.Y. 1996) (internal citations omitted). Instead, Defendant offers two consumer surveys it conducted in 2020 and 2022 showing that consumers associated the CDLC with a specific brand or company only 4.4% or 4.2% of the time. (Dkt. 136-2, ¶¶ 105–106.) Plaintiff argues that Defendant's consumer surveys were "hampered by serious flaws" and are therefore "unreliable." (Dkt. 125, Resp. to ¶¶ 105–106.)[10] The Court need not make a determination of the reliability of Defendant's studies because, in the absence of evidence proffered by Plaintiff, this factor weighs against a finding of secondary meaning. *See C.M.B. Prods.*, 2022 WL 2704506, at *4 ("[T]he absence of any evidence as to marketplace perception weighs against a finding of secondary meaning.").

---

[9] Plaintiff conducted a "likelihood of confusion" survey and suggests that, "[t]hough likelihood of confusion has not been raised[,] this Court can find, *sua sponte*, that [Defendant's] intentional or direct copying gives rise to a presumption of a likelihood of confusion." (Dkt. 124, at 21.) Plaintiff, however, cites no case law for this proposition. For this reason and others, the Court declines to *sua sponte* consider Plaintiff's likelihood of confusion survey.

[10] Plaintiff's brief provides no specific support for its attacks on Defendant's consumer surveys, (Dkt. 124, at 13–14), but its Counter Statement of Material Facts asserts that Defendant's 2020 survey sourced its participants from the wrong geographic and demographic market, (Dkt. 125, ¶ 107), and that the 2022 consumer survey "failed to adequately replicate the marketplace for [Plaintiff's] product" by improperly redacting certain stimuli from the packaging at issue. (*Id.* ¶ 113.) As mentioned, the Court need not opine on the reliability of these surveys because it is the *absence* of this type of evidence proffered by Plaintiff that guides the Court's analysis on this factor. *See C.M.B. Prods.*, 2022 WL 2704506, at *4.

### 2. Length and Exclusivity of Use

Plaintiff used the CDLC for its 2.7-ounce Edge Tamer starting in April 2015. (Dkt. 125, ¶ 11.) Because Defendant began selling Edge Booster in November 2016, the maximum amount of time during which Plaintiff had "exclusive use" of the CDLC at issue was 18 months.[11] However, a far longer period of exclusive use is generally required to show acquired distinctiveness. *See Bubble Genius LLC v. Smith*, 239 F. Supp. 3d 586, 600 (E.D.N.Y. 2017) ("Secondary meaning has been found when continuous exclusive usage of a trade dress occurred over a five-year period." (citing *Landscape Forms, Inc.*, 113 F.3d at 381)). Indeed, the Lanham Act sets a five-year benchmark of exclusive and continuous use of a mark as constituting *prima facie* evidence of acquired distinctiveness, *see* 15 U.S.C § 1052(f), and "courts within this circuit adhere closely" to that five-year benchmark when analyzing this factor. *C.M.B. Prods.*, 2022 WL 2704506, at *6 (collecting cases). Thus, given the short length of Plaintiff's usage of the CDLC and the non-exclusivity of its use in the hair products industry, this factor weighs against a finding of secondary meaning for Plaintiff's CDLC.

### 3. Sales Success

In assessing the sales-success factor, courts have considered, *inter alia*, sales volume, *Easy Spirit, LLC v. Sketchers U.S.A., Inc.*, 515 F. Supp. 3d 47, 64–65 (S.D.N.Y. 2021); market share, *Conn. Cmty. Bank v. Bank of Greenwich*, 578 F. Supp. 2d 405, 414–15 (D. Conn. 2008); and whether sales grew or declined over time, *RVC Floor Decor, Ltd. v. Floor and Decor Outlets of Am., Inc.*, 527 F. Supp. 3d 305, 320 (E.D.N.Y. 2021). *See Capri Sun GmbH v. Am. Beverage*

---

[11] The Court puts "exclusive use" in quotation marks because other hair product suppliers were using the CDLC or similar containers at this time as well. (*See* Dkt. 136-2, ¶ 15 (noting that StyleSexyHair was using a CDLC for its Control Maniac product "since at least as early as 2010" and during the relevant time period here).)

*Corp.*, 595 F. Supp. 3d 83, 155 (S.D.N.Y. 2022), *mot. to certify appeal denied*, No. 19-CV-1422 (PAE) (VF), 2022 WL 3137131 (S.D.N.Y. Aug. 5, 2022).

To begin, Plaintiff provides data showing the sales volume of the 2.7-ounce Edge Tamer grew significantly in the relevant time frame. In 2015, the product in the CDLC sold 62,744 units (Dkt. 125, ¶ 37), and in 2016, the number of units sold rose to 242,045 (*id.* ¶ 39). Additionally, Plaintiff has provided evidence that an increasing share of Plaintiff's revenue was coming from its Edge Tamer line of products—beginning at 25% in 2014 and growing to 70% in 2020. (*Id.* ¶¶ 49-56.) Plaintiff's evidence regarding the increasing success of the Edge Tamer product would be compelling if it specified that the amount of the "companywide sales" from Edge Tamer products were due to the 2.7-ounce product instead of the entire Edge Tamer line. Unfortunately, Plaintiff's evidence is not so tailored. *See* 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* ("*McCarthy*") § 15:49 (5th ed. 2023) ("Raw sales figures need to be put into context to have any meaning. That is, if a company says that its sales of goods or services under the mark are $x, that number cannot be said to be "impressive" or "persuasive" evidence of secondary meaning without knowing how $x compares with the norms of that industry.").

Therefore, because Plaintiff has shown an upward trajectory in the volume of sales of the CLDC product at issue during a two-year period, but lacks more conclusive evidence regarding the market share or growth and decline of its 2.7-ounce Edge Tamer product over time, this factor weighs only slightly in favor of Plaintiff.

### 4.    Advertising Expenditures

Plaintiff has provided evidence that it spent $52,000 in 2015 and $67,000 in 2016 on advertising expenses "for all products" exclusive of travel expenses. (Dkt. 136-2, ¶ 51–52.)

Defendant argues that Plaintiff's advertising focused on the Edge Tamer and EBIN New York brands, not the specific CDLC at issue. (Dkt. 136-1, at ECF 32.) Plaintiff, in turn, asserts that much of its advertising occurred through "personal visits to retail stores" in which Plaintiff's representatives "[w]hen introducing [Edge Tamer] to [the retailers and customers], . . . highlighted the Trade Dress packaging." (Dkt. 125, ¶¶ 27, 29, 30.) Plaintiff's conclusory assertion that the 2.7-ounce CDLC was highlighted during visits to retailers is undermined by Plaintiff's President, who elaborated on Plaintiff's advertising efforts in a November 16, 2021 deposition, noting the practice of Plaintiff's representatives to provide retailers with a poster containing images of *all* Edge Tamer products for display in the stores' entrances or near their cash registers. (Pl's. Ex. F., Dkt. 126-7, at 115–16; *see also McCarthy* § 8:8.50 ("Secondary meaning cannot be proven by advertising that merely pictures the claimed trade dress and does nothing to emphasize it or call attention to it.").) The fact that Plaintiff's "classic," four-ounce product does not come in the CDLC further undercuts the conclusion that Plaintiff's advertising specifically highlighted the alleged trade dress or reached the level of expenditure necessary for a finding of secondary meaning.[12]

Therefore, the advertising expenditures factor also weighs against a finding of secondary meaning.

### 5. Unsolicited Media Coverage

Plaintiff submitted evidence of two industry periodicals—BNB Magazine and CosmoBiz—that published articles about Plaintiff's products. Whether these articles were unsolicited, however, is unclear.

---

[12] That Plaintiff dedicated approximately 13% of its revenue toward advertising does not alter the Court's analysis, as this figure is still devoid of any specific ties to the CDLC.

For example, when asked at his November 16, 2021 deposition whether Plaintiff had done anything to solicit the interview of him for the feature article in BNB Magazine in October 2015, Plaintiff's President Park said, "If you['re] advertising every single month then they do something, interview the company that is doing [the] advertising." (Pl's. Ex. F, Dkt. 126-7, at 130.) Upon closer inspection, the article offered by Plaintiff appears to be a promotional package that is more fairly characterized as marketing or advertising and not unsolicited coverage. (*See* Pl's Ex. L, Dkt. 126-13, at ECF 9–10.)

As for the June 2016 interview of Plaintiff's CEO James Park in CosmoBiz magazine, this coverage actually undermines Plaintiff's case. First, Plaintiff represents that this article "introduced [Plaintiff's] 2.7 oz 24 Hour Edge Tamer as its best selling item." (Pl's. Counter Statement of Material Fact, Dkt. 125, ¶ 44.) While the article in question does feature a photograph of the 2.7-ounce CDLC, the article broadly touts "24 Hour Edge Tamer" as Plaintiff's "best selling item," and does not specifically mention or focus on its 2.7-ounce product. (Pl's. Ex. AA, Dkt. 128-1.) Plaintiff's attempt to narrow the statement contained in the article is therefore unavailing. Second, the article itself notes that "[o]nly 3-4 brands of edge control were available a few years ago, but now [i.e., June 2016] almost all the major chemical companies have released edge control products." (Dkt. 128-1, at ECF 3.) This confirms that edge control products had begun to saturate the market by June 2016, which further undermines the uniqueness of Plaintiff's product and demonstrates that the parties were functioning in a competitive marketplace. *FC Online Mktg., Inc.*, 2015 WL 4162757, at *9 (explaining that trade dress claim must be "construed in the light of strong federal policy in favor of vigorously competitive markets") (quoting *Landscape Forms, Inc.*, F.3d at 379).

Finally, the Court notes that if the article were helpful to Plaintiff's position, the Court likely would not consider it, because, according to Defendant, Plaintiff did not produce it until well after discovery had closed (*see* Dkt. 138-1, at 2). *See Town & Country Linen Corp. v. Ingenious Designs LLC*, 556 F. Supp. 3d 222, 268 (S.D.N.Y. 2021) (stating that a document that was not produced in response to the defendants' document requests was not properly considered on summary judgment). In any event, to the extent the Court has considered the article, it shows that the unsolicited media factor does not weigh in Plaintiff's favor.

6.     Attempts to Plagiarize

Coming to the sixth and final secondary-meaning factor, Plaintiff vigorously asserts that Defendant intentionally copied Plaintiff's CDLC with the purpose of confusing the purchasing public into buying Defendant's product. (Dkt. 124, at 17.) There is some evidence in the record to support Plaintiff's position that Defendant copied Plaintiff's CLDC. To begin with, Defendant's CEO Lee had extensive conversations with Defendant's Chinese manufacturer about finding a container that was the "same" as Plaintiff's CDLC. (Dkt. 125, ¶ 64.) Additionally, one of Defendant's distributors texted Lee a photograph of Edge Booster on a shelf next to Plaintiff's CDLC in what appears to be a retail store. (Dkt. 126-17.) Lee responded over a series of texts, "Where is this[?] That was really harsh[.] They made it look like they were selling it while confusing others on purpose[.]" (*Id.*) Lee's reaction to the photograph does not evidence an intent on Defendant's part to confuse the purchasing public into buying Defendant's product, but it does reflect Lee's acknowledgement that a consumer might confuse the parties' products based on their appearance side by side. What these messages clearly show, however, is Defendant's desire for Edge Booster to compete with Plaintiff's product.

Unfortunately for Plaintiff, the law does not preclude imitative intent in Lanham Act actions. *See Easy Spirit*, 515 F. Supp. 3d at 67 ("[I]t is well-established in this Circuit that 'imitative intent . . . does not necessarily mandate' a finding of secondary meaning." (quoting *Bristol-Myers Squibb Co.*, 973 F.2d at 1042)). Indeed, "[i]t cannot automatically be inferred that intentionally copying a plaintiff's trade dress is for the purpose of deceiving consumers as to the source of the product." *Fun–Damental Too, Ltd. v. Gemmy Indus. Corp.,* 111 F.3d 993, 1005 (2d Cir. 1997).[13]

Therefore, this factor also does not weigh in favor of finding secondary meaning because evidence of Defendant's intent to compete with Plaintiff by imitating the CDLC—which is a common container in the hair products industry—is not the same as the intent to deceive buyers as to the source of the product. *Cf. Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 745 (2d Cir. 1998) (affirming district court's finding in favor of defendants on a trademark claim). To conclude otherwise would undermine the goals of the Lanham Act to construe trade dress claims "in the light of strong federal policy in favor of vigorously competitive markets." *Landscape Forms, Inc.*, 223 F.3d at 378.

\*       \*       \*

---

[13] Even in the face of a defendant who "deliberately copied elements" of a plaintiff's trade dress, courts in this circuit have declined to make a finding of secondary meaning. *See Kind LLC v. Clif Bar & Co.*, No. 14-CV-770 (KMW) (RLE), 2014 WL 2619817, at \*4–5 (finding that, though the plagiarism factor weighed in favor of plaintiff, its trade dress nevertheless had not acquired secondary meaning). In finding that the plaintiff's packaging had not acquired secondary meaning, the *Kind* court noted that Kind was seeking trade dress protection for packaging that excluded its logo. *Id.* But because Kind had not shown that its packaging—without the logo—had acquired secondary meaning, Kind's claim for trade dress protection failed. *Id.* at \*5. So, too, here. Even if the parties in this action used the same or highly similar CDLC, their logos are dissimilar. There is no evidence that Defendant attempted to copy Plaintiff's product so closely as to replicate *both* the container *and* the marks contained on Plaintiff's container. Defendant's CDLC prominently features Defendant's Edge Booster trademark.

At most, then, Plaintiff can point to the sales-success factor as slightly supporting the position that its CDLC acquired secondary meaning by the time Defendant released Edge Booster. While every factor "need not be proved," *Thompson Med. Co., Inc. v. Pfizer Inc.*, 753 F.2d 208, 217 (2d Cir. 1985), where "only one of the factors probative of secondary meaning" is proved, such proof cannot sustain a finding of secondary meaning. *See Mana Prods., Inc.*, 65 F.3d at 1070 (affirming summary judgment for defendant where only factor pointing in claimant's favor was advertising); *see also Easy Spirit*, 515 F. Supp. 3d at 68 (S.D.N.Y. 2021) (finding that only the sales success factor weighed in favor of plaintiff and dismissing plaintiff's trade dress claim); *Gerffert*, 41 F. Supp. at 217 (finding no secondary meaning where "Plaintiffs may only point, tenuously at best, to *one* of the six factors in arguing that [plaintiffs'] catalogues acquired secondary meaning." (emphasis in original)).

Thus, even assuming *arguendo* that Plaintiff's alleged trade dress, its 2.7-ounce CDLC, is descriptive, Plaintiff cannot show that the CDLC acquired secondary meaning,[14] so as to make it distinctive and protectable under the Lanham Act. Defendant is therefore entitled to summary judgment on Plaintiff's Lanham Act claim of trade dress infringement.

### III.    Plaintiff's State-Law Claims

The Court "may decline to exercise supplemental jurisdiction" over Plaintiff's related state-law claims, if, among other things, it has already "dismissed all claims over which it has original jurisdiction," i.e., its federal Lanham Act claim of trade dress infringement. 28 U.S.C. § 1367(c)(3). In the "usual case in which all federal-law claims are eliminated before trial," the

---

[14] Because Plaintiff has not shown that the CDLC has acquired secondary meaning, "there is no need to explore in any detail the issue of functionality." *MZ Wallace Inc. v. Fuller*, No. 18-CV-2265 (DLC), 2018 WL 6715489, at *12 (S.D.N.Y. Dec. 20, 2018)

so-called *Gibbs* factors of "judicial economy, convenience, fairness, and comity," which the Court should also consider before declining to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c), will "point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715 (1966)); *see also Gibbs*, 383 U.S. at 726 ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.").

In *Blau Plumbing*, upon affirming the dismissal of the plaintiff's advertisement-based trade dress claim on summary judgment, Seventh Circuit Judge Richard Posner concluded that the district court was "wrong to go on and decide the merits of [the plaintiff's] state law claim for false advertising." *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 604, 611 (7th Cir. 1986). "State law claims should not be retained for adjudication in federal court when the sole remaining basis for federal jurisdiction is the judge-made doctrine of pendent jurisdiction, unless there are pressing reasons for retention; none has been shown here." *Id.* at 612. This case is no different.

Because the Court is dismissing the sole federal claim in this suit, and because the values of judicial economy and comity would be best served by this outcome, the Court dismisses the state law claims without prejudice. *See N.Y. Mercantile Exch., Inc. v. IntercontinentalExchange, Inc.*, 497 F.3d 109, 118–19 (2d Cir. 2007) (dismissing plaintiff's state-law claims, after dismissing its federal copyright claim, where adjudication of state-law claims would require "resolving additional issues of fact"), *cert. denied*, 552 U.S. 1259 (2008).[15]

---

[15] Given that there are no remaining claims in this matter, there is no need for the Court to address Defendant's motion for summary judgment as to Plaintiff's punitive damages request or Defendant's motion to strike Plaintiff's equitable claims. Both of those motions are denied as moot.

**CONCLUSION**

For the reasons set forth above, the Court (i) dismisses Plaintiff's federal Lanham Act claim of trade dress infringement *with* prejudice and (ii) dismisses its related state-law claims without prejudice to be re-filed in state court. Because the Court grants summary judgment in favor of Defendant, Plaintiff's cross-motion on Defendant's affirmative defenses is denied as moot. The Clerk of Court is directed to enter judgment accordingly.

SO ORDERED.

*/s/ Pamela K. Chen*

Pamela K. Chen
United States District Judge

Dated: September 20, 2023
       Brooklyn, New York